IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Robbin E. Chavis,                       :

                   Plaintiff         :     Civil Action 2:11-cv-00917

       v.                          :     Judge Graham

Michael J. Astrue,                 :     Magistrate Judge Abel
Commissioner of Social Security,
                  Defendant    :

**REPORT AND RECOMMENDATION**

Plaintiff Robbin E. Chavis brings this action under 42 U.S.C. §§405(g) and 1383(c)(3)  for review of a final decision of the Commissioner of Social Security denying her  application for Disability Insurance and Supplemental Security Income benefits. This matter is before the  Magistrate Judge for a report and recommendation on the parties' cross-motions for summary judgment.

**Summary of Issues.** Plaintiff Robbin E. Chavis maintains she became disabled at age 42 by psychological impairments, obesity, cystitis, irritable bowel syndrome, migraine headaches, and thorocolumbar scoliosis. Chavis completed two years of college and has worked as an administrative assistant and a customer service representative. She last worked in September 2007. The administrative law judge found that Chavis retained the ability to perform light work involving simple, routine tasks with occasional contact with coworkers and no contact with the public.

Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge's finding that several of her mental impairments were non-severe was medically inaccurate, unreasonable, and prejudicial;
- The administrative law judge unquestioningly accepted the state agency opinions while slandering the treating sources;
- The hypothetical questions posed to the vocational expert failed to include limitations in the medical opinions adopted by the administrative law judge as the basis for plaintiff's residual functional capacity;
- The administrative law judge failed to analyze the effects of plaintiff's obesity as required by Social Security Ruling 02-1p; and,
- The administrative law judge failed to properly assess the limitations and symptoms of interstitial cystitis as required by Social Security Ruling 02-2p.

**Procedural History.** Plaintiff Robbin E. Chavis filed her application for disability insurance benefits on January 12, 2009, alleging that she became disabled on September 2, 2007, at age 42, by bi-polar disorder, anxiety, depression, and irritable bowel syndrome. (R. 167-76, 210.) The application was denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. On December 29, 2010, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified. (R. 47.) A vocational expert also testified. On January 26, 2011, the administrative law judge issued a decision finding that Chavis was not disabled within the meaning of the Act. (R. 26.) On August 26, 2011, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security. (R. 1-6.)

**Age, Education, and Work Experience.** Robbin E. Chavis was born June 30, 1965. (R. 167.) She has a high school education and completed two years of college. (R. 217.) She has worked as an administrative assistant and a customer service

2

representative at a insurance call center and cell phone call center.  She last worked October 19, 2007.  (R. 210.)

**Plaintiff's Testimony.** Plaintiff Robbin Chavis testified that she lived alone in a disability apartment complex. She drove to the grocery store about once a week. She finished the 11th grade in high school and earned her GED. She completed two years of college and earned an associate's degree in criminal justice.

Plaintiff testified that she had problems with her memory. The longest job she held was as a shift leader for Chipotle, which lasted 11 months. She was fired for absenteeism. Her other jobs lasted only approximately two or three months. Her absenteeism was the result of depression and anxiety. She also had nightmares that caused her to lose sleep. She is treated by a psychiatrist for bipolar disorder, post-traumatic stress disorder, and a personality disorder. She also received treatment from a psychologist.

She had a hard time concentrating. Her medications caused her to shake and the resulting embarrassment increased her depression. Lithium caused her to shake, but other medications have not worked as well.

Chavis testified that she had a few friends that she talked to. She enjoyed watching movies, although she had difficulty following a plot.

Chavis testified that she had fibromyalgia. She took Lyrica for fibromyaligia, which provided some relief at times. After undergoing a  colon resection, she could no longer lift anything over 10 pounds. She also suffered from migraine headaches and

had arthritis in her feet. She reported that she was depressed and cried a lot. She did not

like to be around crowds of people. She was able to use the telephone and the phone

book. She did not have a bank account.

She was hospitalized once for attempting suicide. She visited her grandson a

couple of times of week, which reduced her suicidal thoughts. She had nightmares and

flashbacks every night. She had thoughts of wanting to cut herself to release her

emotional pain and transfer it to physical pain. She had frequent diarrhea and had to go

to the bathroom seven or eight times a day.

It was her decision to attend vocational rehabilitation. She used to smoke

marijuana because she had a poor appetite. She was convicted of forgery in 1999.

(R. 52-68.)

### **Medical Evidence of Record.**

### **Physical Impairments.**

<u>Licking Memorial Hospital</u>. On April 11, 2007, plaintiff presented at the

emergency room with complaints of migraine headaches. (R. 391.)

On May 2, 2007, plaintiff was admitted for nausea, vomiting, abdominal pain

and a headache. (R. 365, 371.) Chavis underwent a CT scan of her abdomen and pelvis.

There was no evidence of renal or ureteral lithiasis. (R. 364.) Plaintiff was diagnosed

with a urinary tract infection with history of chronic interstitial cystitis. (R. 388.)

On June 14, 2007, plaintiff presented at the emergency room for evaluation of

knee pain. (R. 358.) On October 18, 2007, plaintiff was treated at the emergency room for

4

a headache. (R. 347.) On November 16, 2007, plaintiff presented at the emergency room with complaints of a migraine and nausea. (R. 333.)

In March 2009, plaintiff reported having blood in her urine and suprapubic pain. (R. 1222.) She was diagnosed with chronic interstitial cystitis. (R. 1227.)

Angela M. Morris, M.D.  On December 14, 2007, Dr. Morris began treating Chavis. Plaintiff reported that she had a falling out with her previous doctor. Plaintiff was diagnosed with bipolar disorder when she was in her 20s. It had worsened in the last 7-10 years. She reported feeling moody and having poor concentration. She said she could not function day-to-day. Xanax had provided some relief. Plaintiff also had severe interstitial cystitis and bad migraines. (R. 879-84.) On January 8, 2008, plaintiff telephoned the nurse and reported that her medication was not working. Plaintiff was instructed to go to the emergency room for evaluation. (R. 890.) On February 14, 2008, plaintiff telephoned the doctor's office following a visit to the emergency room. Plaintiff had continued shortness of breath, and she was instructed to return to the emergency room. (R. 898.)

On April 22, 2008, plaintiff complained of fast-paced breathing while exercising and numbness in her arms. Plaintiff had lost 10 pounds in the past two months from exercising. She was incontinent twice the day before and had back pain. (R. 917-21.)

W. Jerry McCloud, M.D. On April 29, 2009, Dr. McCloud, a state agency physician, reviewed the record and opined that plaintiff's physical impairments were not severe. (R. 1248.)

5

<u>John Abad, M.D.</u> In August 2009, Dr. Abad, a primary care physician, noted that plaintiff reported having blood in her urine.  Plaintiff had severe left flank pain, which was worsened by walking and relieved by Vicodin. (R. 1336-37.)

In September 2009, plaintiff complained of flank pain. (R. 1335.) In November 2009, plaintiff complained of left flank pain after running out of Vicodin, urinary frequency, and blood in her urine. (R. 1386-87.) Plaintiff was ambulatory with a steady gait and appeared comfortable. (R. 1386-88.)

<u>Bodo Knudsen, M.D.</u> In an August 2009 urology consultation, Dr. Knudsen noted that plaintiff complained of urinary frequency, urgency and dysuria. (R. 1344.) She had no episodes of urinary retention. Her bladder was not distended, and she had no flank tenderness. Dr. Knudsen referred plaintiff to Dr. Gilleran for further management of her symptoms. (R. 1345.)

<u>Jason P. Gilleran, M.D.</u> On November 5, 2009, Dr. Gilleran conducted diagnostic procedures on plaintiff's bladder and diagnosed her with mild cystitis. (R. 1588.) A CT scan of plaintiff's abdomen and pelvis showed a possibility of minimal debris in the urinary bladder. (R. 1378.) Retrograde pyelograms were unremarkable. (R. 1585.) Plaintiff's bladder could hold over 1200 ml and did not show any significant petechiae or glomerulations. There was one small area of focal redness. (R. 1585.) The findings were not "necessarily diagnostic for interstitial cystitis." He suspected that her pelvic pain was outside the bladder and suggested additional treatment options. (R. 1585.)

6

Ralph Graham, M.D. On December 15, 2009, Dr. Graham completed a case

analysis and summarized the record as follows:

> This is an appeal of a claim initially based on anxiety and other
> psychological, [irritable bowel syndrome] which is adversely affected by
> the depression and anxiety. She reports problems lifting and carrying due
> to her left knee but she is not applying for that. Other than the lifting and
> carrying she makes no other allegations of functional limitations on the
> application. On the ADL form she only circled psychological limitations.
> She can walk 2 miles without needing to stop. Symptoms report indicates
> insomnia and other psychological conditions. Statements from [claimant]
> are credible since there is no functional loss alleged. Third party
> assessment regarding balance and walking is not consistent with the other
> MER and is not given full credibility. Medical records show no complaints
> of loss of balance or knee problems. Pre-operative evaluation 6/30/09
> Licking [Memorial] does not list any such problems in the past history.
> . . .
> [Claimant] has a BMI 31 but has not had complications as a result.
>
> She did have irritable bowel syndrome. Since the finding of a not severe
> impairment on initial on 6/02/09 [claimant] had a sigmoid colectomy
> [with] low pelvic anastomosis. Following surgery (6/28) she had an
> evaluation at the ER for her abdominal wound. At that time she had no
> [complaints of] anorexia, abdominal pain, nausea, diarrhea, vomiting or
> appetite changes. Also pertinent negative findings include gait changes,
> vertigo, headache and paralysis. She does have [a history of] migraines,
> but no recent IP/ER/OV. Her final [diagnosis] was factitious melena and
> wound check.

(R. 1359.)

**Psychological Impairments.**

Eric M. Layne, M.D. On January 10, 2008, Dr. Layne, a psychiatrist, began

treating Chavis. Plaintiff was referred to Dr. Layne by her primary care physician based

on increasing complaints related to her bipolar disorder. She reported being

significantly depressed for the past 7 years. She had a history of abusive relationships

7

and difficulty maintaining a job. She experienced a lot of anxiety, anger, and irritability. Her sleep was poor, and her energy level was low. She had racing thoughts. Her appetite varied. She experienced anhedonia, poor focus, and feelings of guilt. She had occasional nightmares and was easily startled. With respect to symptoms of mania, plaintiff acknowledged experiencing periods of mania lasting 3 to 4 weeks that included grandiosity, decreased need for sleep, impulsivity, increased socialization, and racing thoughts. She reported a history of marijuana use and still used it approximately twice a year. Dr. Layne diagnosed bipolar disorder, type I, most recent episode mixed, severe without psychotic features and rule out diagnoses of obsessive compulsive disorder and post-traumatic stress disorder. He assigned a Global Assessment of Functioning ("GAF") score of 55. (R. 759-62.)

On February 6, 2008, plaintiff reported that her medications had been stolen. Dr. Layne refilled her prescription for Klonopin, but he warned her he would not do so again. Plaintiff reported anxiety and tearfulness. She had low motivation and was isolating herself. Her sleep and energy level were variable. (R. 764-65.) On March 19, 2008, plaintiff reported increased depression and occasional passive suicidal thoughts. She described herself as moody and irritable. Her sleep was poor, and her energy level was low. She reported increased anxiety attacks. She had racing thoughts. She reported poor appetite and some weight loss. She had crying spells and passive thoughts about death. (R. 767-68.)

On April 21, 2008, plaintiff reported sensory and motor deficits on her left side. She reported jerking and strange movements in her left arm and leg. She had a tendency to drop or throw things. She also reported numbness and tingling. She slept only 2 to 3 hours per night. Her affect was bright, reactive, potentially slightly hypomanic. Her current GAF score was 60-65. (R. 770-71.) On June 2, 2008, plaintiff reported that she was "better I guess." (R. 773.) Dr. Layne encouraged her to look for work. *Id.*

On August 4, 2008, plaintiff reported that her energy level was good and that her mood was okay. Her mood was more stable although she still had highs and lows. She had some irritability, but she denied anhedonia. She walked regularly. Dr. Layne encouraged Chavis to use as little Klonopin as possible and to plan to discontinue using it. (R. 1064-66.) On October 6, 2008, Dr. Layne assigned a GAF score of 70. Plaintiff reported that things had been great. She had scheduled an appointment with Bureau of Vocational Rehabilitation ("BVR"). Her focus and concentration had improved. (R. 1067.)

On January 5, 2009, Dr. Layne assigned plaintiff a GAF score of 60. Plaintiff reported that things have been horrible. She obtained a job through BVR, but it only lasted two days. On Christmas, she put a loaded gun in her mouth, but since that time she asked her roommate to put all the guns away. She only slept 2-3 hours per night and had night terrors. She had racing thoughts, feelings of worthlessness, and low appetite. (R. 1070-71.) On February 17, 2009, plaintiff reported that things had been

9

rough. She was depressed and temperamental. She isolated herself. She had a lot of physical complaints, which had increased her anxiety. On March 31, 2009, plaintiff reported that her mood had not been bad. She had her own apartment. Her sleep and energy level were good. She had been able to minimize her Klonopin use. She had been more social. (R. 1493-94.) On June 16, 2009, plaintiff reported that she had been hospitalized for ongoing GI problems and had a partial colectomy. Her mood was somewhat irritable. She was tearful and mildly dysphoric. She was sleeping well, but she had nightmares. She had enjoyed reading. (R. 1491-92.) On August 11, 2009, plaintiff reported that she had been anxious lately. She recently discovered that one of her kidneys was swollen and she was concerned that she was becoming very physically ill. (R. 1489-90.) On September 22, 2009, plaintiff reported that her mood had been up and down. She had some dysphoria, irritability, and anxiety. (R. 1487-88.) On November 3, 2009, Dr. Layne noted that plaintiff had been relatively stable. Plaintiff only used one Klonopin in the last six weeks. Her sleep remained poor. (R. 1485-86.)

On January 12, 2010, plaintiff complained of depression. She had been experiencing mood swings, irritability, tearfulness, and passive thoughts about death. (R.1 483-84.) On February 1, 2010, Dr. Layne noted that plaintiff had been continuing to struggle. Plaintiff blamed her physical problems for her difficulty sleeping. (R. 1481-82.) On March 1, 2010, plaintiff reported that she was a mess. She was depressed and isolating herself. She had low motivation, tearfulness, and passive suicidal thoughts. (R. 1479-80.) On March 22, 2010, plaintiff reported that she had been irritable and isolating

10

herself. She was experiencing symptoms of depression and anxiety. Dr. Layne assigned a GAF score of 55. (R. 1477-78.) On April 21, 2010, plaintiff reported that things had been a little better. She had been walking. She was recently diagnosed with fibromyalgia. She had nightmares. Her appetite was good. (R. 1475-76.) On June 24, 2010, plaintiff reported that things had been going pretty well. She was not experiencing sustained dysphoria or significant anxiety. (1473-74.) On August 27, 2010, plaintiff reported that her emotions had been "all over the place," which she attributed to her hormone replacement therapy. She had been expanding her social network and doing some volunteer work. She tried to walk on a daily basis. (R. 1471-72.)  On October 8, 2010, plaintiff reported that things were up and down. Her sleep remained disrupted by nightmares. She denied sustained dysphoria or significant anxiety. She had continued to do some walking, but she had developed foot pain. Her appetite was fair. On mental status examination, her affect was fairly reactive and slightly tearful at times. (R. 1469-70.)

On October 20, 2010, Dr. Layne completed a mental residual functional capacity questionnaire. With respect to social interaction, Dr. Layne opined that plaintiff had marked limitations in her abilities to accept instruction from or respond appropriately to criticism from supervisors and to work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes. Plaintiff had moderate limitations in her ability to respond appropriately to co-workers or peers and to relate to the general public and maintain socially appropriate behavior. With respect to

11

sustained concentration and persistence, Dr. Layne opined that plaintiff had marked limitations in her abilities to perform and complete work tasks in a normal workday or week at a consistent pace, to work in cooperation with or in proximity to others without being distracted by them, to maintain attention and concentration for more than brief periods of time, and to perform at production levels expected by most employers. She was moderately limited in her abilities to process subjective information accurately and to use appropriate judgment and to carry through instructions and complete tasks independently. With respect to adaptation, plaintiff had marked impairments in her abilities to respond appropriately to changes in work setting, to behave predictably, reliably and in an emotionally stable manner. She had moderate impairment of her abilities to remember locations, workday procedures and instructions and to be aware of normal hazards and take necessary precautions. She had mild impairment of her ability to maintain personal appearance and hygiene. Plaintiff had marked impairment of her ability to tolerate customary work pressures. Plaintiff's condition was likely to deteriorate if she was placed under stress, particularly the stress of a job. Dr. Layne noted that plaintiff had limited ability to avoid being distracted, irritable, and anxious in stressful, demanding situations. (R. 1497-99.)

Moundbuilders Guidance Center. Lisa Marie Green, M.S., L.P.C.C., counseled plaintiff from November 29, 2007 through September 11, 2008. (R. 1049-60.) Plaintiff received psychotherapy from Karen Jane Kaston, M.S.W., L.I.S.W. from October 30, 2008 through December 11, 2008 (R. 1046-48.)

Floyd Sours, M.A. On March 14, 2008, Mr. Sours completed a psychological evaluation at the request of the Bureau of Disability Determination. Plaintiff was arrested in 1999 for forgery. In 1999 or 2000, she was arrested for shoplifting. She reported that she did not have any alcohol or drug problems or past substance abuse treatment. She reported anxiety and depression. She was treated by a psychiatrist and received counseling from Moundbuilders Guidance Center. When she was in her 20s, she was hospitalized for a suicide attempt. She was diagnosed with manic depression and possibly post-traumatic stress disorder.

Plaintiff reported that she had had many jobs off and on for short periods of time. She usually left jobs because of depression and panic attacks. She reported that she was fired many times.

On mental status examination, Chavis exhibited an adequate, but minimal, range of emotion. She reported feeling depressed on a daily basis. She experienced withdrawal, poor concentration, loss of interest in things, over-ideation, mood swings, and  high energy. She was argumentative and at times grandiose. She took lithium. She slept poorly. She had suicidal ideation without a plan. Her appetite was adequate. Robbin reported 4 to 5 panic attacks in the past two weeks. She experienced a rapid heartbeat, sweating, dizziness, black-outs, nausea, shortness of breath, hyperventilation, and hot and cold flashes. She was afraid of closed places and heights, but her fears were not disabling.

13

Chavis was oriented in all four spheres. She could recall the four most recent presidents and four digits forward. Her memory function was at least marginally intact. She had less than marginal insight and only marginal judgment.

Plaintiff's daily activities included waking up between 5:30-6:00 a.m., taking care of personal hygiene, eating, taking medicine, watching television, playing movies or video games, and doing some housework. Her hobbies included painting, making candles, and reading. Because of her depression, she did not do her hobbies anymore.

Mr. Sours diagnosed bipolar disorder, mixed and panic disorder. He assigned a GAF score of 55. (R. 735-38.) Mr. Sours concluded:

1. Robbin was able to understand and follow instructions throughout the interview. It is this examiner's opinion that there would be no known impairment in this area in a work setting at present.

2. Robbin was able to maintain sufficient attention to perform simple repetitive tasks. However, it is this examiner's opinion that she would have moderate impairment in a work setting as a result of bipolar and panic disorder symptomatology impacting in a work setting.

3. She was able to relate to this examiner in the interview. However, due to bipolar disorder and panic disorder, it is this examiner's opinion that a mild impairment in a work setting would exist at present.

4. Robbin would have a moderate impairment in the area of withstanding the stress and pressures associated with day-to-day work activities.

(R. 738.)

14

<u>John Waddell, Ph.D.</u> On March 27, 2008, Dr. Waddell, a psychologist, reviewed the record and completed a psychiatric review technique and a mental residual functional capacity assessment. (R. 741-58.) Plaintiff was diagnosed with bipolar disorder, mixed and panic disorder. Dr. Waddell concluded that plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation.

With respect to understanding and memory, plaintiff had no significant limitations. With respect to sustained concentration and persistence, she was moderately limited in her abilities to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. She had no significant limitations with respect to social interaction. With respect to adaption, she was moderately limited in her ability to respond appropriately to changes in the work setting.

Dr. Waddell gave equal weight to consulative examiner and Chavis's treating physician. She was capable of performing simple as well as more complex task instructions in a setting that did not require a fast pace or high production quotas. She required a relatively static environment. Chavis would also do better in a setting that

15

did not require much interaction with others. Plaintiff's allegations appeared credible. (R. 757.)

Joan Williams, Ph.D. On April 2, 2009, Dr. Williams, a psychologist, reviewed the record and completed a psychiatric review technique and a mental residual functional capacity assessment. (R. 1194-1211.) Dr. Williams concluded that plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social function, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation.

With respect to understanding and memory, Dr. Williams opined that plaintiff was moderately limited in her abilities to understand and remember detailed instructions, to maintain attention and concentration for extended periods and to work in coordination with or proximity to others without being distracted by them, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. With respect to social interaction, plaintiff was moderately limited in her abilities to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. With respect to adaptation, plaintiff was moderately impaired in her ability to respond appropriately to changes in the work setting.

16

Dr. Wilson concluded that plaintiff's allegations were not entirely credible. Chavis told her psychiatrist that her BVR work attempt failed because of her mental impairment, but this was not supported by BVR's records, which indicated that plaintiff had a successful adjustment to work. The BVR noted that physical factors caused plaintiff to fail at her attempt.

<u>Claire Robitaille, Ph.D.</u> Dr. Robitaille, a clinical psychologist, provided psychotherapy to Chavis from August 2009 through October 2010. (R. 1592-1642.) Dr. Robitaille diagnosed plaintiff with bipolar disorder and noted secondary diagnoses of sexual abuse, an unspecified relational problem, and an unspecified personality disorder. Dr. Robitaille consistently found plaintiff cooperative and alert and that her thought process was within normal limits. (R. 1593-96, 1602, 1604, 1606, 1608-10, 1612-13, 1615-16, 1621, 1623, 1628, 1631, 1636-37.) Plaintiff reported depression related to her health issues and stressful life circumstances. (R. 1615-16, 1619, 1621, 1623, 1626, 1628). In March 2010, Dr. Robitaille's treatment notes indicated that plaintiff's mood and affect were normal. (R. 1595-96, 1604, 1606.) Plaintiff was described as improving. (R. 1595-96, 1604, 1606.)

On August 21, 2009, Dr. Robitaille completed a mental status questionnaire and a daily activities questionnaire. (R. 1321-25.) She described plaintiff as generally depressed. Dr. Robitaille diagnosed plaintiff with bipolar disorder, most recently depressed. She described plaintiff's ability to remember, understand, and follow directions and maintain attention as good. Plaintiff's ability to sustain concentration,

17

persist at tasks, and complete them in a timely fashion was poor. Plaintiff avoided social

interaction and new situations. Plaintiff had poor stress tolerance, fear of social

interaction, and poor social skills. Chavis's abilities to prepare food, perform household

chores, attend to personal hygiene, shop, drive, and pay her bills were good. Chavis

attended counseling on a regular basis.

On October 29, 2010, Dr. Robitaille completed a mental residual functional

capacity questionnaire (R. 1500-02.) With respect to social interaction, plaintiff had

marked limitations in her ability to accept instruction from or respond appropriately to

criticism from supervisors, to respond appropriately to co-workers or peers, and to

relate to the general public and maintain socially appropriate behavior. Plaintiff had

moderate impairment of her ability to work in coordination with or in proximity to

others without distracting them or exhibiting behavioral extremes. With respect to

sustained concentration and persistence, plaintiff had marked impairments of her

abilities to perform and complete work tasks in a normal work day or week at a

consistent pace and to work in cooperation with or in proximity to others without being

distracted by them. Plaintiff had extreme impairment in her abilities to carry through

instructions and complete tasks independently, to maintain attention and concentration

for more than brief periods of time, and to perform at production levels expected by

most employers. Plaintiff was moderately limited in her ability to carry through

instructions and complete tasks independently. With respect to adaption, plaintiff had

marked impairment of her ability to respond appropriately to changes in work setting

18

and extreme impairment of her ability to behave predictably, reliable and in an emotionally stable manner. She had moderate impairment in her ability to remember locations, workday procedures and instructions. Plaintiff was mildly limited in her abilities to be aware of normal hazards and take necessary precautions and to maintain personal appearance and hygiene.  Plaintiff was extremely limited in her ability to tolerate customary work pressures. Dr. Robitaille noted that plaintiff had difficulty managing her anxiety in a structured situation that requires continuous expectations, interactions, and adjustments. Plaintiff had significant depression and anxiety. (R. 1501-02.)

Kevin Edwards, Ph.D. On September 7, 2009, Dr. Edwards, a psychologist, completed a case analysis on reconsideration. He noted that plaintiff was cooperative, irritable, and anxious. Plaintiff went outside everyday, shopped every two to three weeks, and attended a monthly support meeting. (R. 138.)

**Administrative Law Judge's Findings.**

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.

2. The claimant has not engaged in substantial gainful activity since September 2, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: bipolar disorder, status post sigmoid colectomy with low pelvic anastomosis, history of irritable bowel syndrome, and interstitial cystitis (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) such that the claimant can lift and carry 20 pounds occasionally, and 10 pounds frequently, sit for a total of 6 hours in an 8 hour workday, with normal breaks, stand and walk for a total of 6 hours in an 8 hour workday, with normal breaks, and push and pull within those limitations. She cannot climb ladders, ropes, or scaffolds. The claimant is limited to simple routine tasks, with only occasional contact with coworkers, and no contact with the public.

6.      The claimant cannot perform her relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on June 30, 1965 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and communicates in English (20 CFR 404.1564 and 416.964).

9.      At the claimant's age the issue of transferable skills is not material (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from September 2, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 18-25.)

**Standard of Review**. Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" *Id*. *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments**. Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge's finding that several of her mental impairments were non-severe was medically inaccurate, unreasonable, and prejudicial. Plaintiff maintains that the administrative law judge erred when he concluded that many of plaintiff's alleged mental impairments have not resulted in any significant limitation in her ability to perform basic work activities. The

21

administrative law judge only acknowledged plaintiff's diagnosis of bipolar disorder as a severe impairment. The administrative law judge refused to recognize that plaintiff's anxiety and depression were severe. The administrative law judge improperly evaluated her credibility based on her felony conviction and history of engaging in illicit drug use.

- The administrative law judge unquestioningly accepted the state agency opinions while slandering the treating sources. Plaintiff argues that the administrative law judge failed to evaluate the medical opinions in the record using the factors outlined in 20 C.F.R. § 404.1527(d). Plaintiff's treating physicians have the benefit of providing a longitudinal view of her history. This opinion evidence is particularly appropriate when the severity of an impairment has fluctuated over time. Chavis also argues that the administrative law judge made his own independent findings and only gave weight to those conclusions of the reviewing physicians. Plaintiff maintains that the administrative law judge slandered Drs. Layne and Robitaille by stating that there opinions were "premised on compensation purposes."

- The hypothetical questions poses to the vocational expert failed to account for limitations in the medical opinions adopted by the administrative law judge as the basis for plaintiff's residual functional capacity. Plaintiff contends that the state agency prepared two mental residual functional capacity assessments. In both assessments, the abilities to complete a normal workday and workweek

22

without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, was found to be moderately limited. The vocational expert acknowledged on cross-examination that she had not considered those limitations when testifying concerning jobs available to plaintiff. Chavis maintains that by failing to account for these limitations, the testimony of the vocational expert does not constitute substantial evidence that jobs exist in substantial numbers for an individual matching either of the hypothetical vocational profiles.

- The administrative law judge failed to analyze the effects of plaintiff's obesity as required by Social Security Ruling 02-1p. Plaintiff argues that the administrative law judge was required to consider her obesity in combination with her other impairments at all stages of the sequential evaluation. The administrative law judge must do more than mention the fact of obesity in passing. Here, the Court should remand the case in order for the administrative law judge to analyze Chavis's limitations and how her obesity impacted her ability to function and work.

- The administrative law judge failed to properly assess the limitations and symptoms of interstitial cystitis as required by Social Security Ruling 02-2p. Plaintiff maintains that the administrative law judge improperly concluded that her allegations of constant diarrhea and no appetite were not credible

based on her weight of over 200 pounds. Plaintiff argues that the assertion that these conditions cannot coexist is a medical opinion that the administrative law judge is not entitled to make. The administrative law judge failed to apply Social Security Ruling 02-2p. The administrative law judge failed to consider the possibility that plaintiff symptoms of her mental impairment could be attributed to her interstitial cystitis.

**Analysis.** <u>Credibility Determinations: Controlling Law</u>. Pain is an elusive phenomena.  Ultimately, no one can say with absolute certainty whether another person's subjectively disabling pain and other symptoms preclude all substantial gainful employment.  The Social Security Act requires that the claimant establish that he is disabled.  Under the Act, a "disability" is defined as "inability to engage in any substantial gainful activity *by reason of any medically determinable or mental impairment* which can be expected . . . to last for a continuous period of not less than 12 months.  . . ."  42 U.S.C. §423(d)(1)(A) (emphasis added).

Under the provisions of 42 U.S.C. §423(d)(5)(A), subjective symptoms alone cannot prove disability. There must be objective medical evidence of an impairment that could reasonably be expected to produce disabling  pain or other symptoms :

> An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms

alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability. Objective medical evidence of pain or other symptoms established by medically acceptable clinical or other laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability.

The Commissioner's regulations provide a framework for evaluating a claimant's symptoms consistent with the commands of the statute:

(a) *General*. In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in §404.1528(b) and (c). By other evidence, we mean the kinds of evidence described in §§404.1512(b)(2) through (6) and 404.1513(b)(1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work. However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are

> disabled. In evaluating the intensity and persistence of your
> symptoms, including pain, we will consider all of the available
> evidence, including your medical history, the medical signs and
> laboratory findings and statements about how your symptoms affect
> you. (Section 404.1527 explains how we consider opinions of your
> treating source and other medical opinions on the existence and
> severity of your symptoms, such as pain.) We will then determine
> the extent to which your alleged functional limitations and
> restrictions due to pain or other symptoms can reasonably be
> accepted as consistent with the medical signs and laboratory findings
> and other evidence to decide how your symptoms affect your ability
> to work.

20 C.F.R. §404.1529(a). A claimant's symptoms will not be found to affect his ability to

work unless there is a medically determinable impairment that could reasonably be

expected to produce them. 20 C.F.R. § 404.1529(b). If so, the Commissioner then

evaluates the intensity and persistence of the claimant's pain and other symptoms and

determines the extent to which they limit his ability to work. 20 C.F.R. § 404.1529(c). In

making the determination, the Commissioner considers

> all of the available evidence, including your history, the signs and
> laboratory findings, and statements from you, your treating or nontreating
> source, or other persons about how your symptoms affect you. We also
> consider the medical opinions of your treating source and other medical
> opinions . . . .

*Id.*

In this evaluation of a claimant's symptoms, the Commissioner considers both

objective medical evidence and "any other information you may submit about your

symptoms." 20 C.F.R. § 404.1529(c)(2). The regulation further provides:

> Because symptoms, such as pain, are subjective and difficult to quantify,
> any symptom-related functional limitations and restrictions which you,

26

your treating or nontreating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled. We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating or nontreating source, and observations by our employees and other persons. Section 404.1527 explains in detail how we consider and weigh treating source and other medical opinions about the nature and severity of your impairment(s) and any related symptoms, such as pain. Factors relevant to your symptoms, such as pain, which we will consider include:

(i) Your daily activities;

(ii) The location, duration, frequency, and intensity of your pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3). When determining the extent to which a claimant's

symptoms limit his ability to work, the Commissioner considers whether the claimant's

statements about the symptoms is supported by or inconsistent with other evidence of

record:

In determining the extent to which your symptoms, such as pain, affect your capacity to perform basic work activities, we consider all of the available evidence described in paragraphs (c)(1) through (c)(3) of this section. We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled. We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your treating or nontreating source or other persons about how your symptoms affect you. Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.

20 C.F.R. § 404.1529(c)(4). SSR 96-7p explains the two-step process established by the

Commissioner's regulations for evaluating a claimant's symptoms and their effects:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms. . . .

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's

statements based on a consideration of the entire case record.

When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements. In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:

   1. The individual's daily activities;

   2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

   3. Factors that precipitate and aggravate the symptoms;

   4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

   5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

   6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g. lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

   7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

   Case law interpreting the statute and regulations. At the outset, it is important to

keep in mind that symptoms are the claimant's "description of [his/her] physical or

mental impairment." 20 C.F.R. § 404.1528(a). Inevitably, evaluating symptoms involves making credibility determinations about the reliability of the claimant's self-report of his symptoms. *Smith ex rel E.S.D. v. Barnhart*, 157 Fed.Appx. 57, 62 (10th Cir. December. 5, 2005) (not published)("Credibility determinations concern statements about symptoms.")

"Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain." *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 247 (2007); SSR 96-7p, 1996 WL 374186 (July 2, 1996). That test was first set out in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986). First, the Court must determine "whether there is objective medical evidence of an underlying medical condition." If so, the Court must then

> examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Duncan*, 801 F.2d at 853. Any "credibility determinations with respect to subjective complaints of pain rest with the ALJ." *Siterlet v. Secretary of Health and Human Services*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d at 247 (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997); *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir.1990); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir.1981)). The ALJ is required to explain her credibility determination in her decision, which "'must be

sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *See id.* (quoting SSR 96-7p).  Furthermore, the ALJ's decision must be supported by substantial evidence.  *Rogers,* 486 F.3d at 249.

Discussion of ALJ's credibility determination.  The administrative properly evaluated plaintiff's credibility:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause symptoms; however, the allegations concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity. The claimant clearly has significant impairments, symptoms and limitations, but for the following reasons it is found that they are not quite as debilitating as alleged.
>
> In terms of the claimant's alleged physical impairments, the undersigned finds that the record possesses evidence that undermines her allegations of disability. Many of the examinations of the claimant's gastrointestinal system yielded unremarkable findings. During a December 2009 examination, the claimant's gastrointestinal system exhibited normal functioning. (Exhibit 27F). In November 2009, the claimant was observed to be comfortable–despite complaints of pain that she rated as a 10 on a scale of 0 to 10. (Id.). In August 2009, the claimant's gastrointestinal system was found to be normal after a review of her systems. (Exhibit 25F).
>
> Moreover, at the hearing the claimant complained of constant diarrhea and no appetite. (Hearing Testimony). However, the claimant's weight is over 200 pounds. (Id.). Thus, the undersigned finds the claimant's assertions at the hearing less than credible. The undersigned also finds that the claimant's credibility is deficient; as the record indicates, she has a felony conviction for forgery and a history of engaging in illicit drug use. (Hearing Testimony). Forgery is a crime involving honesty.

(R. 21-22.)  With respect to Chavis's mental impairment, the administrative law judge

stated:

> With respect to the claimant's alleged mental impairment of depression, the undersigned finds that the claimant's subjective complaints as to the limitations of [her] impairment are not fully credible. At the hearing, the claimant testified that she struggles with anxiety, mood swings, and depression (Hearing Testimony). However, the record indicates that her recent mental status examinations and GAF scores are pretty unremarkable. Specifically, in October 2010, the claimant was observed as being well groomed and dressed, and exhibiting normal speech, good eye contact, fairly reactive affect, linear, logical, and goal directed thought process, no suicidal or homicidal ideations, and fairly good insight and judgment. (Exhibit 28F).
>
> During an August 2010 mental status examination, the claimant displayed cooperativeness, normal speech, good eye contact, a reactive affect, linear, logical, and goal oriented thought process, no suicidal or homicidal ideations, no psychosis, fair insight, judgment, and impulse control. She was alert and oriented. There was no abnormal motor activity. (Id.). Moreover, her GAF score was 60 to 65 indicating moderate to mild symptoms. (Id.). In June, April, March, and January 2010, the claimant exhibited similar behavior during mental status examinations, and registered GAF scores of 65, 65, 55, and 55 to 65, respectively.
>
> Further, the claimant has not been hospitalized for psychiatric reasons since her alleged onset date. Treatment notes also indicate that the claimant has responded positively to treatment, and has exhibited more control over her depression and anxiety-related symptoms. (Exhibit 32F). The many unremarkable mental status examinations and GAF scores of the claimant undermine her assertions as to the severity of her mental impairments. Thus, the restrictions included in the residual functional capacity articulated above accommodate the claimant's alleged mental impairments.

(R. 22-23.) The administrative law judge properly evaluated plaintiff's mental

impairment. He reasonably determined that plaintiff's bipolar disorder was severe.

Despite plaintiff's allegations concerning post-traumatic stress disorder and a

personality disorder, these disorders were not consistently diagnosed by plaintiff's treatment providers. Dr. Layne diagnosed plaintiff with bipolar disorder, which indicates that his belief that this description adequately described her array of symptoms. Although Dr. Layne repeatedly discussed plaintiff's symptoms of depression and anxiety, he did not identify depression and anxiety as separate impairments.

It was not improper for the administrative law judge to consider plaintiff's felony conviction or history of drug abuse. Additionally, the administrative law judge did not err when he concluded that plaintiff's weight did not support her allegations concerning ongoing diarrhea and loss of appetite. The administrative law judge's credibility determination is supported by substantial evidence.

Treating Doctors' Opinions.  Plaintiff argues that the administrative law judge erred in rejecting the opinions of  Drs. Layne and Robitaille.

Treating Doctor: Legal Standard.  A treating doctor's opinion[1] on the issue of disability is entitled to greater weight than that of a physician who has examined plaintiff on only one occasion or who has merely conducted a paper review of the medical evidence of record.  20 C.F.R. § 404.1527(d)(1).  *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983).  The Commissioner's regulations explain that Social Security generally gives more weight to a treating doctors' opinions because treators are usually "most able to provide a detailed, longitudinal picture" of the claimant's medical impairments. 20 C.F.R. § 404.1527(d)(2).  When the treating doctor's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record" the Commissioner "will give it controlling weight. " *Id.*

---

[1]The Commissioner's regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2). Treating sources often express more than one medical opinion, including "at least one diagnosis, a prognosis and an opinion about what the individual can still do." SSR 96-2p, 1996 WL 374188, at *2. When an administrative law judge fails to give a good reason for rejecting a treator's medical opinion, remand is required unless the failure does not ultimately affect the decision, *i.e.,* the error is *de minimus. Wilson,* 378 F.3d at 547. So reversible error is not committed where the treator's opinion "is patently deficient that the Commissioner could not possibly credit it;" the administrative law judge's findings credit the treator's opinion or makes findings consistent with it; or the decision meets the goal of 20 C.F.R. § 1527(d)(2) but does not technically meet all its requirements. *Id.*

Even though a claimant's treating physician may be expected to have a greater insight into his patient's condition than a one-time examining physician or a medical adviser, Congress specifically amended the Social Security Act in 1967 to provide that to be disabling an impairment must be "medically determinable." 42 U.S.C. §423(d)(1)(A). Consequently, a treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic test evidence. *Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir. 2004); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson*, 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v. Califano*, 558 F.2d 253, 254-256 (5th Cir. 1975). 20 C.F.R. §§404.1513(b), (c), (d), 404.1526(b), and 404.1527(a)(1)[2].

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 404.1527(d)(1). When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic

---

[2]Section 404.157(a)(1) provides:
You can only be found disabled if you are unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. See §404.1505. Your impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. See §404.1508.

35

techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).  In determining the weight to assign a treating source's opinion, the Commissioner considers the length of the relationship and frequency of examination; nature and extent of the treatment relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision.  *Id.*  Subject to these guidelines, the Commissioner is the one responsible for determining whether a claimant is disabled.  20 C.F.R. § 404.1527(e)(1).

Social Security Ruling 96-2p provides that "[c]ontrolling weight cannot be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."  Consequently, the decision-maker must have "an understanding of the clinical signs and laboratory findings and what they signify."  *Id.*  When the treating source's opinion "is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight . . . ."  The Commissioner's regulations further provide that the longer a doctor has treated the claimant, the greater weight the Commissioner will give his or her medical opinion.  When the doctor has treated the claimant long enough "to have obtained a longitudinal picture of your impairment, we will give the source's

36

[opinion] more weight than we would give it if it were from a non-treating source." 20 C.F.R. §404.1527(d)(2)(I).

The Commissioner has issued a policy statement about how to assess treating sources' medical opinions. Social Security Ruling 96-2p. It emphasizes:

1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2. Controlling weight may be given only in appropriate circumstances to medical opinions, *i.e.*, opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

Even when the treating source's opinion is not controlling, it may carry sufficient weight to be adopted by the Commissioner:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p.

The case law is consistent with the principles set out in Social Security Ruling 96-2p.  A broad conclusory statement of a treating physician that his patient is disabled is not controlling.  *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  For the treating physician's opinion to have controlling weight it must have "sufficient data to support the diagnosis."  *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).  The Commissioner may reject the treating doctor's opinions when "good reasons are identified for not accepting them."  *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); 20 C.F.R. § 404.1527(d)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"); *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004).  Even when the Commissioner determines not to give a treator's opinion controlling weight, the decision-maker must evaluate the treator's opinion using the factors set out in 20 C.F.R. § 404.1527(d)(2).  *Wilson,* 378 F.3d at 544; *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009). There remains a rebuttable

38

presumption that the treating physician's opinion "is entitled to great deference." *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242 (6th Cir. 2007); *Hensley*, above. The Commissioner makes the final decision on the ultimate issue of disability. *Warner v. Commissioner of Social Security,* 375 F.3d at 390; *Walker v. Secretary of Health & Human Services,* 980 F.2d 1066, 1070 (6th Cir. 1992); *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

<u>Treating Doctor: Discussion</u>.  The administrative law judge rejected the opinions of Drs. Layne and Robitaille:

> In October 2010, Dr. Layne assessed the claimant's mental residual functional capacity. (Exhibit 29F). As a result of his assessment, Dr. Layne opined that the claimant suffered from marked limitations in the areas of social interaction, sustained concentration and persistence, and adaption. (Id.). Dr. Robitaille also assessed the claimant's mental residual functional capacity, and opined that she suffered from extreme limitations in the aforementioned areas. (Exhibit 30F). Despite the treating relationships Drs. Layne and Robitaille share with the claimant, their opinions are not consistent with the medical evidence in the record.

> As discussed above, mental status examinations of the claimant have yielded many unremarkable findings, and her GAF scores have been rather normal. (Exhibit 28F). In light of the claimant's mental status examinations and GAF scores, the opinions articulated by Drs. Layne and Robitaille that the claimant is not able to sustain concentration and persistence or adapt to workplace situations 50% of the day etc are not supported by the record. (Exhibits 28F. 29F and 30F). In addition, because the opinions and medical source statements of Drs. Layne and Robitaille were being premised on compensation purposes, the undersigned finds the mental status examination in their treatment notes to be more persuasive.  Treatment records are generally entitled to more weight than checklists prepared exclusively for compensation purposes. Thus, the undersigned finds their functional opinions to be inconsistent with the

records as a whole, including their own treatment records and GAF scores
and to merit little weight.

(R. 24.)

As an initial matter, plaintiff's contention that the administrative law judge
slandered Drs. Layne and Robitaille is without merit. The administrative law judge's
statement concerning "compensation purposes" does not relate to compensation the
doctors received in return for the opinions. Rather, the administrative law judge is
referring to opinions that were issued to demonstrate entitlement to disability benefits.
The administrative law judge properly considered whether the opinions made
concerning eligibility for Social Security were supported by the treatment notes. He
concluded that they were not. The administrative law judge gave sufficient reasons for
rejecting the opinions of Drs. Layne and Robitaille and adopting the opinions of Drs.
McCloud, Sours, Waddell, Williams, and Edwards.

Accuracy of Hypothetical Given Vocational Expert: Legal Standard.  Plaintiff
argues that the Administrative Law Judge's hypothetical to the vocational expert was
not supported by substantial evidence because it failed to include that plaintiff had
moderate limitations in her abilities to complete a normal workday and workweek
without interruptions from psychologically based symptoms and to perform at a
consistent pace without an unreasonable number and length of rest period.

In determining whether a claimant is disabled, an administrative law judge
makes a residual functional capacity determination.  That finding is an "assessment of

40

the claimant's remaining capacity for work" once his or her limitations have been taken into account.  20 C.F.R. § 416.945.  It is "a more complete assessment of her physical and mental state and should include an 'accurate[ ] portray[al] [of her] individual physical and mental impairment[s].'  *Varley,* 820 F.2d at 779;  *Myers v. Weinberger,* 514 F.2d 293, 294 (6th Cir.1975) (per curiam)."  *Howard v. Commissioner of Social Security,* 276 F.3d 235, 239 (6th Cir. 2002).

When a  vocational expert testifies, the administrative law judge asks the expert to assume certain facts about the claimant's work abilities.  The facts in this hypothetical are the administrative law judge's residual functional capacity findings.  The administrative law judge must accurately state each limitation that affects the claimant's ability to work.  If there is not substantial evidence supporting the limitations the administrative law judge includes in the hypothetical to the  vocational expert, then the expert's testimony is not substantial evidence supporting the Commissioner's decision denying benefits.  *Howard,* 276 F.3d at 240-42.  If a limitation that substantially affects the claimant's ability to work is established by uncontroverted medical evidence, it is error for the administrative law judge to omit this limitation from the hypothetical given the administrative law judge.  276 F.3d at 242.

Accuracy of Hypothetical Given Vocational Expert: Discussion.  The administrative law judge concluded that plaintiff retained the residual functional capacity to perform light work as defined in 20 CFR §§ 414.1567(b) and 416.967(b) such that the claimant can lift and carry 20 pounds occasionally, and 10 pounds frequently,

sit for a total of 6 hours in an 8 hour workday with normal breaks, and push and pull within those limitations. Plaintiff could not climb ladders, ropes, or scaffolds. Plaintiff was limited to simple, routine tasks, with only occasional contact with coworkers and no contact with the public.

Plaintiff argues that the state agency psychologists' findings of moderate limitations in her abilities to complete a normal workday and workweek without interruptions and to perform at a consistent pace should have been included in the administrative law judge's hypothetical question posed to the vocational expert. The administrative law judge formulated a residual functional capacity assessment that was consistent with Dr. Waddell's opinion that plaintiff retained the ability to complete simple and complex tasks in a relatively static setting that did not require a fast pace, high production quotas, or significant interaction with others. (R. 23-24, 747.) Drs. Williams and Edwards concluded that plaintiff retained to the ability to perform complex tasks, interact in simple work-site exchanges, make simple work-site adjustments, and maintain a schedule of work-like activities. (R. 23-24, 1211, 1328.) The vocational expert identified jobs that were based on the administrative law judge's hypothetical question. The administrative law judge was not required to include limitations in the hypothetical question that he concluded were not supported by substantial evidence.

Obesity.  Plaintiff argues that the administrative law judge failed to consider the impact of her obesity on her ability to work as required by SSR 00-3p. The

administrative law judge acknowledged that plaintiff weighed over 200 pounds.
Plaintiff does not point to any treatment for her obesity or identify any functional
limitations attributed to her weight. Although Dr. Graham noted that plaintiff had a
Body Mass Index of 31, he indicated that she did not have any corresponding
complications as a result. (R. 1359.) Because plaintiff has not identified any evidence
demonstrating that her obesity caused functional limitations, the administrative law
judge did not err in failing to identify plaintiff's obesity as a severe impairment. *Casey v.
Sec. of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993)("Plaintiff has the
ultimate burden of establishing the existence of disability.").

SSR 02-2p. The introduction to the Social Security Ruling 02-2p recognizes that
interstitial cystitis is a medically determinable impairment that may be the basis for a
finding of disability.

> The Act and our implementing regulations require that an individual
> establish disability based on the existence of a medically determinable
> impairment; that is, one that can be shown by medical evidence, consist-
> ing of symptoms, signs, and laboratory findings. Disability may not be
> established on the basis of an individual's statement of symptoms alone.
>
> This Ruling explains that IC (a complex, chronic bladder disorder), when
> accompanied by appropriate symptoms, signs, and laboratory findings, is
> a medically determinable impairment that can be the basis for a finding of
> "disability." It also provides guidance for the evaluation of claims
> involving IC.

The Ruling states that interstitial cystitis "is a complex, chronic bladder disorder
characterized by urinary frequency, urinary urgency, and pelvic pain." SSR 02-2p, ¶ 1.
The symptoms vary, response to treatment varies, and in some cases treatment fails:

The symptoms of IC may vary in incidence, duration, and severity. The causes of IC are currently unknown, and treatments are directed towards relief of symptoms. While no treatment is uniformly effective for everyone, there are many treatments available, and individuals may obtain some measure of relief. However, response to treatment is variable, and some individuals may have symptoms that are intractable to the current treatments available. Treatment may include bladder distention; bladder instillation; oral drugs, such as the prescription drug Elmiron, anti-depressants, antihistamines, and narcotic analgesics; and the use of trans-cutaneous electrical nerve stimulation.

*Id.* The Ruling provides that interstitial cystitis alone may be disabling:

6. Can We Find an Individual Disabled Based on IC Alone?

If an individual has the medically determinable impairment IC that is "severe" as described in question 7 below, we may find that the IC medically equals a listing, if appropriate. (See 20 CFR 404.1525 and 416.925.) (In the case of a child seeking benefits under title XVI, we also may find that it functionally equals the listings (20 CFR 416.926a).) We also may find in a title II claim, or an adult claim under title XVI, that the IC results in a finding that the individual is disabled based on his or her residual functional capacity (RFC), age, education, and past work experience.

SSR 02-2p, ¶ 6.

When making a residual functional capacity determination, the decision-maker

must consider the impact of interstitial cystitis:

IC can cause limitation of function. The functions likely to be limited depend on many factors, including urinary frequency and pain. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It also may affect ability to do postural functions, such as climbing, balancing, stooping, and crouching. The ability to tolerate extreme heat, humidity, or hazards also may be affected.

The effects of IC may not be obvious. For example, many people with IC have chronic pelvic pain, which can affect the ability to focus and sustain attention on the task at hand. Nocturia (nighttime urinary frequency) may disrupt sleeping patterns. This can lead to drowsiness and lack of mental clarity during the day.

44

IC also may affect an individual's social functioning. The presence of urinary frequency alone can necessitate trips to the bathroom as often as every 10 to 15 minutes, day and night. Consequently, some individuals with IC essentially may confine themselves to their homes. In assessing RFC, we must consider all of the individual's symptoms in deciding how such symptoms may affect functional capacities.

SSR 02-2p, Sequential Evaluation, ¶ 1.

Plaintiff argues that the administrative law judge failed to evaluate her interstitial cystitis in the manner mandated by SSR 02-2p, indeed, he did not even mention the ruling.

While it is not necessarily error for an administrative law judge to fail to explicitly reference a Social Security Ruling in making a disability determination, the decision must fairly set out the legal framework for the disability determination and support that determination with substantial evidence. Here, the administrative law judge failed to examine the intensity persistence, and limiting effects of plaintiff's interstitial cystitis. The decision is void of any discussion of the limitations imposed by plaintiff's impairment. As a result, the administrative law judge's decision does not demonstrate that he followed Social Security Ruling 02-2p in making his decision.

Accordingly, it is **RECOMMENDED** that this case be **REMANDED** to the Commissioner for further consideration of plaintiff Chavis's application for disability benefits consistent with SSR 02-2p.

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the

45

Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).


 s/Mark R.  Abel_____
United States Magistrate Judge